IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

GUNPOWDER CAPITAL MANAGEMENT,     )
LLC d/b/a OLIVER WEALTH           )
MANAGEMENT,                       )
                                  )
          Plaintiff,              )
                                  )
     v.                           )          1:24-cv-914
                                  )
JOSEPH F. DARPEL, III and         )
SMART STEPS WEALTH MANAGEMENT,    )
LLC,                              )
                                  )
          Defendants.             )

## MEMORANDUM OPINION AND ORDER

**OSTEEN, JR., District Judge**

Before this court is Defendants' Motion to Stay. (Doc. 16.)
Defendants have filed a memorandum in support of its motion,
(Doc. 17), Plaintiff has responded, (Doc. 26), and Defendants
have replied, (Doc. 33). For the reasons stated herein,
Defendants' motion will be granted.

## I.  FACTUAL BACKGROUND

A summary of the key facts is set forth below, and
additional facts will be addressed as necessary within this
opinion. This case presents a dispute between Plaintiff
Gunpowder Capital Management LLC d/b/a "Oliver Wealth
Management" ("OWM") and Defendants Joseph F. Darpel, III
("Darpel") and Smart Steps Wealth Management, LLC ("Smart

Steps.") Plaintiff alleges that Defendant Darpel breached his employment agreement by "soliciting OWM's clients to take their business away from OWM and to Darpel's new, competing company." (Compl. (Doc. 1) ¶ 3.) Additionally, Plaintiff contends that "Darpel was covertly appropriating its trade secrets and other confidential, proprietary information." (Id. ¶ 4.) Concurrent with this litigation, Plaintiff and Defendants are engaged in arbitration consistent with the terms of another agreement, the Purchase and Sale of Practice ("APA"). (Id. ¶ 24 n.2). The following sections address the different agreements and claims arising under the agreements.

A.    **The Agreement for Purchase and Sale of Practice**

Plaintiff is a "full-service, independent financial advisory firm formed in 2016." (Id. ¶ 17.) In 2019, Darpel "sold his entire investment advisory business to OWM." (Id. ¶ 1.) The sale finalized on August 2, 2019, and the parties signed the APA. (Id. ¶ 23.)

The APA's terms provided that "OWM acquired all of Darpel's business assets."[1] (Id.) These assets included "all rights to the

_____

[1] At this time, OWM was an affiliate of Hayden Royal, "an SEC-registered corporate investment advisor who provided advisory, wealth management and related services." (Compl. (Doc. 1) ¶ 28.) Despite its affiliation with Hayden Royal, OWM "retained its own employees and clients," and was "permitted to acquire other practices and clients." (Id. ¶ 30.)

Clients and all revenue related thereto." (Id.) The APA also listed by name the clients OWM was purchasing from Darpel and included a Non-Solicitation Agreement. (Id. ¶¶ 24—25.) This agreement required that Darpel

> for a period of three (3) years following the Transaction
> Date as defined in the Purchase Agreement ("Restricted
> Period"), [Defendant] shall not in any function or
> capacity, whether for his own account or the account of
> any other person or entity, solicit the sale of, market,
> or sell products or services similar to those sold or
> provided by Buyer or its affiliates to any of the Clients
> or client accounts on Exhibit A (collectively, the
> "Clients") to the Purchase Agreement.

(Ex. 2 (Doc. 17-2) at 55.)[2] Following the sale, OWM hired Darpel to work as a temporary consultant.[3] (Compl. (Doc. 1) ¶ 26.)

## B. __The Adviser Representative Agreement__

After Darpel worked as a temporary consultant for several months, OWM hired him as a full-time relationship manager for some of OWM's accounts on December 17, 2019. (Id. ¶¶ 27, 32-33.)

---

[2] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

[3] The APA also included a mandatory arbitration clause with the American Arbitration Association ("AAA"). (Compl. (Doc. 1) ¶ 24 n.2.) Because of this clause, Plaintiff explained that it is "not seeking relief arising from the APA from this Court." (Id.) Instead, the APA is "the subject of a pending arbitration." (Id.)

The parties entered into another agreement titled "Adviser Representative Agreement" ("Employment Agreement").[4] (Id. ¶ 31.)

Per this Employment Agreement, Darpel's duties consisted of "being a relationship manager on many of the accounts and clients he sold to OWM under the APA." (Id. ¶ 33.) The Employment Agreement contained a confidentiality provision which required Darpel to acknowledge that he was not permitted

> during the Term or on or after the Termination Date, [to] directly or indirectly publish, disclose, describe, or communicate, or authorize anyone else to publish disclose, describe or communicate to any person, firm, business entity, or corporation, or use to Company's detriment or for purposes other than in the furtherance of the Company Business, any Confidential Information, except as generally allowed in the conduct of Company's business or as authorized, in writing, by Company.[5]

(Id. ¶ 37a.) Further, the Employment Agreement required Darpel to agree to a non-solicitation provision, namely that

> during [his] relationship with the Company and for a period of twelve (12) months following the Termination Date," he would not "either directly or indirectly: (i) solicit or take away any of the Company's clients who were clients or prospective clients of the Company at

---

[4] Hayden Royal permitted its advisors to bring over their own clients from other services and then list those clients in an addendum to their employment agreement; however, because Darpel had already sold his business and all of his clients to OWM, Darpel left this addendum blank. (Compl. (Doc. 1) ¶¶ 35–36.)

[5] As relevant here, the Employment Agreement defined "Confidential Information" to mean, among other things, "customer . . . listings, . . . customer . . . information (including without limitation names, addresses and telephone numbers)." (Compl. (Doc. 1) ¶ 37.)

the time Representative became affiliated with the Company; and (ii) solicit for the purpose of providing services similar to or competitive with the Company Business, any person or entity that was, during the 12 months prior to the Termination Date, a customer or client . . . of Company other than Customers where Representative is listed as the Primary Account Representative.

(Id. ¶ 37b.) The Employment Agreement also contained both a North Carolina choice-of-law provision and a North Carolina forum selection clause.[6] (Id. ¶ 37c.)

## C. **Defendant Darpel's Separation**

On April 19, 2024, Darpel terminated his employment, without notice and effective immediately. (Id. ¶ 42.) Plaintiff alleges that Darpel had been "contemplating and planning his departure for many months prior." (Id.) Plaintiff contends that, following his resignation, Darpel solicited "substantially all of his former clients — all of whom were included in the APA and sale to OWM — to advise them of his departure from OWM, attempting to convince them to terminate their contracts with OWM and move their business to Smart Steps." (Id. ¶ 51.)

Additionally, Plaintiff maintains that Darpel contacted these clients by "improperly access[ing] OWM's client email and address list with his personal cell phone on March 6, 2024."

_____

[6] The Employment Agreement did not include an arbitration clause and is the only agreement under which Plaintiff asserts its claims before this court. (Compl. (Doc. 1) ¶ 24 n.2.)

(Id. ¶ 52.) Plaintiff alleges, upon information and belief, that "Darpel then shared that information with Smart Steps, using it as the platform to which he would direct OWM's clients whom he was soliciting to leave." (Id. ¶ 54.) Plaintiff alleges it has suffered resulting losses of over $50 million in customer assets and at least $550,000 in annualized revenue. (Id. ¶ 55.)

Plaintiff asserts two claims: a claim against Darpel for breaching the Employment Agreement, (id. ¶¶ 56–66), and a claim against both Darpel and Smart Steps under the Defend Trade Secrets Act, 18 U.S.C. § 1836,[7] (id. ¶¶ 67–74).

## II.  **PROCEDURAL HISTORY**

Plaintiff filed its complaint on October 30, 2024. (Compl. (Doc. 1).) On January 10, 2025, Defendants moved to dismiss Plaintiff's third and fourth claims for relief, (Defs.' Partial Mot. To Dismiss (Doc. 14)), and on February 21, 2025, Plaintiff voluntarily dismissed the third and fourth claims, (Notice of Voluntary Dismissal Without Prejudice as to Claims Three and Four of the Compl. ("Voluntary Dismissal") (Doc. 24); Order (Doc. 34)).

_____

[7] Plaintiff initially alleged a claim of tortious interference with contract against Defendant Smart Steps and a claim of conversion against both Defendant Darpel and Defendant Smart Steps, (Compl. (Doc. 1) ¶¶ 75–87), but has since voluntary dismissed those claims, (see Voluntary Dismissal (Doc. 24); Order (Doc. 34)).

- 6 -

On January 10, 2025, Defendants moved to stay this action pending "the resolution of a parallel arbitration between Defendants and Plaintiff Gunpowder Capital Management LLC d/b/a Oliver Wealth Management," (Defs.' Mot. to Stay ("Defs.' Mot.") (Doc. 16) at 1), and filed a memorandum in support, (Defs.' Mem. in Supp. of Mot. to Stay ("Defs.' Mem.") (Doc. 17)). Plaintiff responded in opposition on February 21, 2025, (Pl.'s Resp. in Opp'n to Defs.' Mot. to Stay ("Pl.'s Resp.") (Doc. 26)), and Defendants replied on June 10, 2025, (Defs.' Reply to Pl.'s Resp. in Opp'n ("Defs.' Reply") (Doc. 33)).

On July 22, 2025, this court issued a text order requesting a joint update from the parties as to the status of the arbitration. (Docket Entry 07/22/2025.) The parties jointly responded on August 7, 2025, advising the court that the arbitration had not yet occurred, that "[t]he parties are actively working to negotiate and finalize a new scheduling order for the arbitration while maintaining settlement discussions," and that "the parties are unable to determine when the arbitration will be concluded." (Joint Status Report (Doc. 35) at 1.)

The motion to stay is ripe and ready for ruling. A hearing is not necessary to resolve the motion.

## III. **STANDARD OF REVIEW**

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." Landis v. N. Am. Co., 299 U.S. 248, 254 (1936). To stay proceedings, courts must "balance the various factors relevant to the expeditious and comprehensive disposition of the causes of action on the court's docket." Maryland v. Universal Elections, Inc., 729 F.3d 370, 375 (4th Cir. 2013) (quoting United States v. Ga. Pac. Corp., 562 F.2d 294, 296 (4th Cir. 1977)).

These factors include: "(1) 'the interests of judicial economy'; (2) the 'hardship and equity to the moving party' in the absence of a stay; and (3) the 'potential prejudice to the non-moving party' in the event of a stay." N.C. State Conf. of NAACP v. Cooper, 397 F. Supp. 3d 786, 797 (M.D.N.C. 2019) (quoting White v. Ally Fin. Inc., 969 F. Supp. 2d 451, 462 (S.D.W. Va. 2013)).

When a party requests a stay to resolve pending arbitration proceedings, courts have recognized that a stay "may be appropriate" to settle "common issues of fact relat[ed] to the action." CIP Constr. Co. v. W. Sur. Co., No. 1:18CV58, 2018 WL 3520832, at *9 (M.D.N.C. July 20, 2018). Such action is

- 8 -

appropriate to "further the strong federal policy favoring agreements to arbitrate." (Id.) (quoting AgGrow Oils, L.L.C. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 242 F.3d 777, 782 (8th Cir. 2001)).

Even when the arbitrator's findings would not bind the parties, the Fourth Circuit has recognized that "consideration of judicial economy and avoidance of confusion and possible inconsistent results nonetheless militate in favor of staying the entire action." Am. Home Assurance Co. v. Vecco Concrete Const. Co. of Virginia, 629 F.2d 961, 964 (4th Cir. 1980). Inconsistent results are likely to arise when the merits of a claim "centrally depend" on the resolution of factual issues. Kolman v. Gen. Motors Fin. Co., Inc., No. 5:18-CV-300-BO, 2018 WL 6620888, at *2 (E.D.N.C. Dec. 18, 2018).

## IV. **ANALYSIS**

This court determines that a stay pending the results of arbitration is appropriate. First, resolving this litigation and the pending arbitration requires examination of common questions of fact. Second, a balance of the applicable factors reveals that granting a stay is appropriate to resolve factual issues, avoid inconsistent results, and save both the parties' and this court's resources.

- 9 -

### A.    <u>Common Factual Questions</u>

Defendants ask this court to stay this action pending the resolution of ongoing parallel arbitration between the parties which Defendants contend "will substantially narrow, if not resolve entirely, nearly all of the issues that must be resolved to answer the questions posed in this case." (Defs.' Mot. (Doc. 16) at 2.) Plaintiff concedes that "there is some factual overlap in an ongoing arbitration between the parties and the present matter," but that this case should not be stayed because it "presents unique claims and factual allegations which are wholly distinct from those in arbitration." (Pl.'s Resp. (Doc. 26) at 1–2.) While this litigation and the pending arbitration formally analyze different claims under different agreements, this court agrees with Defendants that the two matters share common issues of fact between the same parties. Particularly, both matters must analyze whether Darpel misused Plaintiff's client list, and whether this client list constitutes a trade secret.

### 1.    <u>Confidential Information</u>

The first common question of fact central to both matters is whether Defendant Darpel misused Plaintiff's client list. Defendants contend that the pending arbitration will resolve the question of "whether Mr. Darpel impermissibly used Plaintiff's

- 10 -

'Confidential Information.'" (Defs.' Mem. (Doc. 17) at 6.)
Conversely, Plaintiff argues that because "the APA and the
[Employment] Agreement define 'confidential information'
differently . . . . [I]t is not only conceivable, but likely
that the resolution of whether or not Darpel unlawfully used or
disclosed confidential information under the APA will not
necessarily determine whether he did so under the [Employment]
Agreement." (Pl.'s Resp. (Doc. 26) at 9–10.)

　　　This court determines that the answer to whether Darpel
misused confidential information is central to both disputes,
and resolution of this common question requires evaluating the
same actions by the same parties in different forums.
Plaintiff's claims "centrally depend" on whether Darpel
accessed, used, and shared confidential information. See Kolman,
2018 WL 6620888, at *2. Conflicting answers by this court and in
arbitration would cause both "confusion and inconsistent
results," which "militate[s] in favor of staying the entire
action." Vecco, 629 F.2d at 964. Moreover, even consistent
results in both forums have the potential to create confusion.
Were Plaintiff to obtain a favorable judgment in both litigation
and arbitration, it might recover in "more than one-satisfaction
for the same injury." Sun Chemicals Trading Corp. v. SGS Control
Servs., Inc., 159 F. App'x 459, 462 (4th Cir. 2005)

(unpublished, per curiam opinion). Such "identical operative allegations" therefore warrant a discretionary stay. (Defs.' Reply (Doc. 33) at 2.)

Additionally, the similarities between both Plaintiffs' arguments and the agreements' definitions support granting a stay. In this present litigation, Plaintiff alleges that Darpel breached the Employment Agreement by "using and sharing Plaintiff's 'Confidential Information' with Smart Steps and by soliciting Plaintiff's purported clients following Mr. Darpel separating from his work with Plaintiff." (Defs.' Mem. (Doc. 17) at 5–6 (quoting Compl. (Doc. 1) ¶¶ 59–64.)) In its Demand for Arbitration, Plaintiff alleges that Defendants breached the APA's Non-Solicitation Agreement by "using [Plaintiff]'s Confidential Information, including the names, addresses and telephone numbers of the Clients." (Ex. 2 (Doc. 17-2) at 15.)) Thus, while the claims may be characterized differently in litigation and arbitration, the resolution of the claims in both forums will require similar factual analysis.

Beyond the arguments' similarities, the definitions in the APA and the Employment Agreement do not appear to be sufficiently dissimilar to warrant denying a stay. In its Response to the Motion to Stay, Plaintiff asserts that the "distinct definition[s]" will "likely" provide different

- 12 -

results. (Pl.'s Resp. (Doc. 26) at 10, 12.) But when Plaintiff submitted its APA claims for arbitration, it provided a copy of the Employment Agreement and explained that this agreement also "included provisions related to the nondisclosure of confidential company and client information." (Ex. 2 (Doc. 17-2) at 9.) Plaintiff then asserted that "[a]lthough the term 'Confidential Information' is defined differently than in the Non-Solicitation Agreement, the substance of the prohibitions is the substantially the same." (Id.) (emphasis added). Given this previous comparison, coupled with the arguments' similarities, this court finds that both forums will apply the same facts to similar standards in different proceedings to reach the appropriate answer.[8] Granting a stay would therefore narrow the issues for this court to decide because the common question of whether Darpel misused Plaintiff's client list will be resolved in arbitration.

---

[8] This court is not interpreting the meaning of the two agreements at this time. Because of the pending arbitration and the applicable standard for granting a discretionary stay, this court only reviews the two definitions to analyze whether "common issues of fact relating to the action may be settled in pending arbitration proceedings." CIP Constr., 2018 WL 3520832, at *9. To do so, this court finds it prudent to consider how the factual issues will be analyzed, without deciding the meaning of both agreements.

- 13 -

2. **Trade Secrets**

Another common question central to both proceedings is whether Plaintiff's client list constitutes a trade secret. Plaintiff's alleged trade secrets in both the arbitration and in this litigation include its client list. (See Arb. Interrogatory (Doc. 33-1) at 4 (identifying "Confidential Information" as including "client contact lists"); Ex. 2 (Doc. 17-2) at 22 (alleging that "Confidential Information" constitutes valid trade secrets); Compl. (Doc. 1) ¶ 69 (alleging "OWM's client list constitutes a protectable trade secret . . . .").) Defendants argue that resolution of Plaintiff's arbitration claim for misappropriation of trade secrets will "significantly narrow[], if not resolve[]" Plaintiff's litigation claim for a violation of the Defend Trade Secrets Act. (Defs.' Mem. (Doc. 17) at 6.)

This litigation and the pending arbitration are governed by different legal standards for trade secrets. In this litigation, the Defend Trade Secrets Act ("DTSA") controls. (See Compl. (Doc. 1) ¶¶ 67-74.) At arbitration, Maryland law controls. (Ex. 2 (Doc. 17-2) at 41, 42, 58; Ex. 3 (Doc. 17-3) at 2.) Although Plaintiff, in submitting its claims to arbitration, alleges a claim of "unfair competition/misappropriation of trade secrets," without identifying any Maryland statutory provision, (Ex. 2

- 14 -

(Doc. 17-2) at 22), the Maryland Uniform Trade Secrets Act ("MUTSA") "displaces conflicting tort . . . law of this State providing civil remedies for misappropriation of a trade secret." Md. Code. Ann., Com. Law § 11-1207(a). Thus, Plaintiff's arbitration claim for misappropriation of trade secrets will be governed by the Maryland Uniform Trade Secrets Act, Md. Code., Com. Law § 11-1201 et seq.

The MUTSA "define[s] a trade secret in substantially the same manner" as the DTSA. Aarow Elec. Sols. v. Tricore Sys., LLC, 693 F. Supp. 3d 525, 538 (D. Md. 2023) (cleaned up) (noting that both statutes require the trade secret to derive economic value from not being readily ascertainable and that the owner of the purported trade secret employ reasonable measures to keep the information secret). Accordingly, despite the different governing standards, the factual questions related to those claims — such as whether Plaintiff derives economic value from its client list and whether Plaintiff employed reasonable measures to keep its client list secret — are common to both proceedings. Further, Plaintiff does not dispute that there are common questions related to the trade secrets-focused claims in

- 15 -

each proceeding.[9] (See generally Pl.'s Resp. (Doc. 26).)
Therefore, this court finds that a discretionary stay is
appropriate to resolve the common question of whether
Defendants' use of Plaintiff's client list constitutes a trade
secret.

## B. **Balance of Factors**

The presence of common questions does not end the analysis.
Courts in this circuit must also "balance the various factors
relevant to the expeditious and comprehensive disposition of the
causes of action on the court's docket." Yadkin Riverkeeper,
Inc. v. Duke Energy Carolinas, LLC, 141 F. Supp. 3d 428, 452
(M.D.N.C. 2015) (quoting Universal Elections, 729 F.3d at 375).
Such factors include "the interests of judicial economy, the

---

[9] Additionally, part of the litigation-based breach of
contract claim is an allegation that Defendant Darpel breached
his Employment Agreement by "soliciting OWM's clients in an
attempt to induce them to move to a competing business, Smart
Steps." (Compl. (Doc. 1) ¶ 61.) This factual allegation overlaps
with the factual allegation that provides the basis for
Plaintiff's arbitration-based tortious interference with
contractual relations claim, (see Ex. 2 (Doc. 17-2) ¶¶ 64-72
("After Darpel's abrupt resignation from OWM, Respondents
intentionally and willfully utilized OWM's Confidential
Information to induce the Clients to cease doing business with
OWM and to breach their exclusive contractual relationships with
OWM.")), and Plaintiff's arbitration-based tortious interference
with prospective advantage claim, (id. ¶¶ 73-78 ("Respondents
began contacting Clients of OWM with the intention of causing
said clients to cease dealing with OWM and to commence dealing
with Smart Steps.")). Accordingly, the resolution of arbitration
on those claims will also resolve questions implicated in the
breach of contract claim before this court.

hardship and inequity to the moving party in the absence of a stay, and the potential prejudice to the non-moving party in the event of a stay." (Id.) (citing White, 969 F. Supp. 2d at 462).

### 1. **Legal Standard**

The parties dispute the applicable legal standard. Plaintiff argues that because it "articulates harm it would face," the Defendants' burden for a stay is "heightened." (Pl.'s Resp. (Doc. 26) at 6) (citing Int'l Refugee Assistance Project v. Trump, 323 F. Supp. 3d 726, 731 (D. Md. 2018)). Plaintiff contends that Defendants "do not identify any sort of irreparable harm which being required to proceed both in this matter and the Arbitration would create." (Id. at 11.) Plaintiff also maintains that Defendants continued use of its trade secrets demonstrates "the heightened risks of harm and prejudice Plaintiff would face." (Id.)

Plaintiff references several cases which support the proposition that the moving party requesting a stay must demonstrate a heightened risk of hardship and justify the stay by evidence that outweighs the potential harm to the opposing party. See Landis, 299 U.S. at 254-55; Williford v. Armstrong World Indus., Inc., 715 F.2d 124, 127 (4th Cir. 1983); Willem Jan M. Van Andel, LLM v. Lindberg, No. 1:23-CV-879, 2024 WL 3718168, at *3 (M.D.N.C. Aug. 8, 2024); Cooper, 397 F. Supp. 3d

- 17 -

at 797; <u>Int'l Refugee Assistance Project</u>, 323 F. Supp. 3d at 731; <u>Yadkin</u>, 141 F. Supp. 3d at 452; <u>Empire Distribs. of N.C., Inc. v. Schieffelin & Co.</u>, 677 F. Supp. 847, 857 (W.D.N.C. 1988), <u>aff'd</u>, 859 F.2d 1200 (4th Cir. 1988). (Pl.'s Resp. (Doc. 26) at 5—8). However, this court finds that the unique circumstances of this case distinguish it from those cited above for three reasons.

First, the parties to this case are the sole participants in both this litigation and the pending arbitration. In <u>Landis</u>, hundreds of claims were filed against twenty-two defendants over the constitutionality of the Public Utility Holding Company Act of 1935. 299 U.S. at 249-50. The Government chose one lawsuit "as a test," and other courts were asked to stay proceedings until the validity of the Act was resolved. <u>Id.</u> at 251. Vacating the stay, the Supreme Court explained that "[o]nly in rare circumstances will a litigant in one cause be compelled to stand aside while a litigant in another settles the rule of law that will define the rights of both." <u>Id.</u> at 255. Likewise, in <u>Williford</u>, the Fourth Circuit affirmed the district court's denial of a discretionary stay in a case brought against twenty-eight defendants after four defendants received automatic stays by filing for Chapter 11 bankruptcy. 715 F.2d at 126.

This case presents a different posture. Instead of potentially forfeiting the right to pursue its claims so that another case with different parties could resolve the central issues, no one other than Plaintiff will be responsible for arbitrating its case. Plaintiff will not be required to "stand aside" while common issues of fact are resolved by others. Landis, 299 U.S. at 255.[10] Nor is this court tasked with weighing "the human aspects of the needs of a plaintiff in declining health as opposed to the practical problems imposed by the proceedings in bankruptcy." Williford, 715 F.2d at 127–28. Instead, Plaintiff will have to argue in arbitration pursuant to an agreement that it made with Defendants and enforced by submitting the claims to arbitration.[11]

_____

[10] Similarly, in Lindberg, the court denied a request to stay proceedings to challenge an arbitral award after the panel made its decision, which was upheld by Dutch courts, and remained unchallenged for years. 2024 WL 3718168, at *3. Thus, common issues of fact were already resolved through arbitration and judicial proceedings.

[11] The court in Empire Distributors also recognized that the plaintiff was "not party to the action judicially reviewing the administrative order." 677 F. Supp. at 852–53. However, this court finds that the decision to deny a stay under the "five categories of abstention doctrine" is distinct from the decision to grant a stay pursuant to an arbitration agreement. Id. at 856. Where abstention necessarily implicates "concern for federal-state relations and jurisprudential restraint" because state courts may be required to resolve unsettled state law questions, id. at 854, the pending arbitration will benefit the parties by resolving factual, not interpretive, questions.

Second, the facts do not present a case of "extraordinary public moment." Int'l Refugee Assistance Project, 323 F. Supp. 3d at 731 (quoting Clinton v. Jones, 520 U.S. 681, 707 (1997). In Yadkin, the court denied a stay that would permit the defendant's "alleged violations to persist, resulting in the further alleged discharge of pollutants into the Yadkin River, High Rock Lake, and their tributaries." 141 F. Supp. 3d at 452. In International Refugee Assistance Project, the court denied a stay in a suit that challenged "the third iteration of the President's efforts to ban the entry of nationals from certain designated countries into the United States." 323 F. Supp. 3d at 729. In Cooper, the court explained that "this action involves, among other things, constitutional challenges to a statute which allegedly imposes discriminatory and unlawful burdens on individuals' right to vote based on race" and denied a stay "in advance of the upcoming election." 397 F. Supp. 3d at 797. Unlike the cases above, a discretionary stay would not be "oppressive in its consequences" to "the public welfare." Int'l Refugee Assistance Project, 323 F. Supp. 3d at 731 (quoting Clinton, 520 U.S. at 707).

Third, as the sole parties to the arbitration, both Plaintiff and Defendants would be bound by the arbitrator's findings on questions of common facts. In Vecco, only one party

- 20 -

was subject to both litigation and arbitration. See 629 F.2d at 964. The Fourth Circuit still recognized that the party was "clearly entitled to a stay" even though "the arbitrator's findings will not be binding as to those not parties to the arbitration." Id. Similarly, the court in CIP Construction Co. identified that one party "may not be bound by the arbitrator's findings" because it was "not a party to the proceeding," yet determined that "considerations of judicial economy and the avoidance of confusion and inconsistent results still warrant a stay."[12] 2018 WL 3520832, at *9. Given that the parties must participate in both this litigation and the pending arbitration, this court determines that CIP Construction Co. and Vecco not only authorize but reinforce the Defendants' request for a stay.

---

[12] Plaintiff contends that CIP Construction Co. "proves why a stay based upon Defendants' speculations as to what might happen from the Arbitration, is inappropriate." (Pl.'s Resp. (Doc. 26) at 8.) Plaintiff explains that the court found it "most important[]" that "liability will be dependent on the outcome of the pending arbitration." CIP Constr. Co., 2018 WL 3520832, at *9. (Id. 26 at 9.) This representation was undeniably important in CIP Construction Co., where the defendant was not a party to the arbitration, and the defendant's future liability in litigation was conditioned on a third party's liability determination in arbitration. But, here, there is no need for Defendants to articulate that conditional relationship because both parties must participate in both forums, and the basis for granting the stay is not to determine a party's obligation to appear but, rather, to resolve common questions of fact.

## 2. __Harm to Plaintiff__

Next, this court determines that the balance of equities supports granting a stay. Regarding the potential harm to the non-moving party, Plaintiff's primary argument is that a stay "would subject Plaintiff to increased harm and substantial prejudice." (Pl.'s Resp. (Doc. 26) at 2.) Namely, a stay would (1) force Plaintiff to "forego recovery, including that arising under an independent contract wholly separate from the Arbitration, for an indefinite period of time," (2) permit Defendants to "continue to reap the benefits of customers Darpel unlawfully solicited, much as Defendants could continue using Plaintiff's Confidential Information, all unencumbered by any potential liability," and (3) prevent Plaintiff from "conducting discovery into many facets of its claims." (Id. at 10–11.)

Defendants reply that "Plaintiff would not be forced to forego recovery for an extended period of time" because, "[i]f Plaintiff were to prevail in the Arbitration, there would be no recovery available to it in this court," as both proceedings revolve around the same injury. (Defs.' Reply (Doc. 33) at 7.) Defendants explain that Darpel's possible continued solicitation of Plaintiff's clients and continued use of Plaintiff's confidential information would not harm Plaintiff, because "Plaintiff does not allege there is an ongoing threat that

- 22 -

Defendants will continue to use a client list to impermissibly contacts [sic] they are already alleged to have solicited," and Plaintiff "does not seek, and has not sought, injunctive relief in [its] Complaint or elsewhere." (Id. at 7.)

This court determines that Plaintiff would not be prejudiced on the basis that a stay would force it to indefinitely "forego recovery." As explained above, the factual allegations regarding Defendants' conduct that underpin Plaintiff's causes of action are substantially the same in both this litigation and the pending arbitration. See supra Section IV.A. Further, Plaintiff's alleged injuries resulting from Defendants' conduct are the same in both proceedings: the loss of millions of dollars in customer assets, (Ex. 2 (Doc. 17-2) ¶ 49 ($40 million); Compl. (Doc. 1) ¶ 55 ($50 million)), and the loss of hundreds of thousands of dollars in annualized revenue, (Ex. 2 (Doc. 17-2) ¶ 49 ($500,000); Compl. (Doc. 1) ¶ 55 ($550,000)). Accordingly, a stay would not prevent Plaintiff from recovering for the injuries allegedly inflicted by Defendants — it merely ensures that Plaintiff's recovery efforts are first addressed in arbitration.

This court also does not find the possibility that Defendants may, during the pendency of the stay, continue to solicit Plaintiff's clients and continue to use Plaintiff's

- 23 -

confidential information a compelling source of prejudice to
Plaintiff. Plaintiff does not request any form of injunctive
relief from this court. Thus, Defendants could continue to
engage in this conduct even if the case were not stayed. But to
the extent that Defendants' conduct continues, liability
associated with that conduct is the subject of the arbitration.
Because of the common questions of fact and the similarities in
the arguments asserted and definitions identified, any concerns
of continued harm will be resolved during arbitration. If any
outstanding questions of liability remain upon resumption of
this litigation, this court's resolution would be expedited with
the benefit of the arbitration's findings as to those common
questions.

Finally, this court finds it unlikely that granting a stay
would stagnate or prevent discovery. Plaintiff argues that a
stay would prevent it from "conducting discovery into many
facets of its claims." (Pl.'s Resp. (Doc. 26) at 10-11.)
However, because of the common allegations and common questions
at issue in both proceedings, the information provided during
arbitration will likely mirror if not entirely duplicate that
discovered during this litigation.

### 3. **Hardship to Defendants**

This court determines that the potential hardship to Defendants outweighs the potential harm to Plaintiffs. Defendants argue that, "given the substantial overlap between Plaintiff's claims in the two proceedings, the risk of inconsistent results in the two proceedings supports a stay of this lawsuit." (Defs.' Mem. (Doc. 17) at 8.) Plaintiff argues in response that "there is no risk of inconsistent judgments," because "the operative underlying claims and facts are substantially distinct." (Pl.'s Resp. (Doc. 26) at 12.)

This court determines that regardless of the outcome in arbitration, denying a stay would create hardship for Defendants. As stated above, a differing conclusion regarding a factual question common to both proceedings would lead to material inconsistencies between the two proceedings. See supra Section IV.A.1. Likewise, a similar conclusion regarding a factual question common to both proceedings would lead to potential confusion between similar judgments awarding overlapping damages. Thus, granting a stay would eliminate the potential hardship resulting from competing, binding decisions.

### 4. **Judicial Economy**

Any dispute between the balance of hardships is belied by the interests of judicial economy. This court agrees with

- 25 -

Defendants' that "[t]he instant lawsuit should be stayed because the Arbitration will resolve nearly all of the issues before this Court or, at the very least, significantly narrow what is at issue in this lawsuit." (Defs.' Mem. (Doc. 17) at 5.) Resolution through arbitration will aid and inform this court's analysis of many issues relevant to the present litigation. Both parties will have the opportunity to argue whether Darpel misused Plaintiff's client list and whether this client list constitutes a trade secret. Based on the representations made before this court, the same parties will have the opportunity to present similar arguments based on common facts, and a factfinder will apply the facts to comparable agreements. Thus, a discretionary stay is warranted based on a balance of applicable factors.

V.    <u>CONCLUSION</u>

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Defendants' Motion to Stay, (Doc. 16), is **GRANTED**. This action is hereby **STAYED** until the arbitration has ended.

**IT IS FURTHER ORDERED** that the parties are to notify this court within fourteen days of the conclusion of arbitration as to the result of arbitration. Counsel may petition this court to dissolve the stay "if the arbitration lasts long enough to cause

a party irreparable harm." <u>DataNational, Inc. v. Yellow Book</u>
<u>Sales & Distribution Co.</u>, No. CIV.A.3:05-CV-00035, 2005 WL
3499929, at *3 (W.D. Va. Dec. 21, 2005).

This the 22nd day of September, 2025.

_____
United States District Judge